Good morning, Your Honors. My name is Eric Grantz. I represent Plaintiff Appellant John Doe. In this 50th anniversary of Brown v. Board of Education, this Court is faced with a stark choice, either to give the imprimatur of the federal courts to a racially segregated school or instead to enforce the nation's oldest civil rights law. In Brown, you were dealing with a state institution. Here, you're dealing with a private institution. Does that make Brown inapplicable? Your Honor, the Supreme Court has said that the standard under the Equal Protection Clause applied in Brown and the standard under the statute in this case, namely 42 U.S.C. section 1981, is coextensive. And in just, in cases, not only one, but two cases last year, the Court applied section 1981 in a manner identical to the Equal Protection Clause. Well, there's no reason for it to reach the 1981 case in either one of those cases, Mr. Counsel. Since the Equal Protection Clause applied to the University of Michigan in those cases and the Equal Protection Clause seemed to be the most stringent standard available, there was no reason for the Court to reach the 1981 question, which would suggest that both of those statements are dicta. The Court did reach the 1981 question in both cases, Your Honor. The Court in one case upheld the policy and said that if the policy survives scrutiny under the Equal Protection Clause, it survives scrutiny under section 1981. No, all of that suggests is that 1981 is in some way less than or equal to the standards for the Equal Protection Clause. It doesn't, all the things that you can infer from that is that 1981 doesn't impose a more rigorous standard than the 14th Amendment. No, Your Honor, because the Court said if, on the other hand, if you make out your claim under the Equal Protection Clause, you also make out your claim under section 1981. And in fact, in the Gratz case involving the undergraduate institution, the Court specifically held in footnote 23 of the case that plaintiffs had established liability under section 1981. Perhaps the Court could have said it was not necessary to reach the question, but in actual fact the Court did reach the question. I think other, numerous other decisions of the Supreme Court and the Courts of Appeals confirm that there is no public-private distinction in section, under section 1981. I cited a clause that section 1981 prohibits discrimination in the making of contracts, both public and private, and no court has... How far does that go? If, let's say Malcolm X decided to have classes for young African American kids in his basement, would a non-African American child have been able to knock on the door and say, I demand to come to your Saturday morning session? Your Honor, there may be some constitutional limitations on the application of section 1981 to private individuals, but what the Court told us in Runyon v. McCrary in 1976 was that, as applied to a private, non-sectarian commercial school... If it's totally non-sectarian, I've read the will under which the trust was established in it, all of the faculty have to be Protestant. Your Honor, this Court specifically held in a reported decision whose name escapes me that Kamehameha Schools is non-sectarian, and plaintiffs so alleged in his complaint, and the defendants admitted so in their answers. But the will still requires Protestants, and the trustees have no power to waive it. I believe, Your Honor, in that case, and I believe it was EEOC v. Kamehameha Schools decided by this Court in a reported decision that that provision of the will actually violated Title VII, and therefore this Court held that perhaps by operation of law, Kamehameha Schools is non-sectarian. I have a question about another piece of that formulation, and that is whether the school counts as a commercial operation when it is heavily subsidized, even though students who pay tuition pay only a fraction of what it actually costs to educate them. What in your view defines commercial in this context? Well, Your Honor, if we look at Runyon v. McCrary, it's apparent that the Supreme Court has said that commercial includes a private school that charges tuition, and that category includes Kamehameha Schools. Again, plaintiffs alleged in his complaint that Kamehameha Schools was a commercial institution within the meaning of Runyon v. McCrary. The defendants did not challenge that allegation, and in fact, the district courts ruled that that point had been established, that Section 1981 applied. I'd like to shift your attention to another aspect of this case, if I may, and that is the question whether in whatever analysis is to be adopted, we should give some special form of analysis to issues involving Native Hawaiian people, and in particular, I'd like to ask you whether it matters that a large portion of the wealth that created this trust came from the Hawaiian royal family, and was originally part of the kingdom's lands. Does that make any difference to our analysis? Your Honor, it does not. The Supreme Court decided a couple of cases in the late 1950s and 1960s involving bequests from wills that had racially restrictive covenants, so to speak. One from Girard College in Philadelphia, Pennsylvania. Well, there wasn't a king of Pennsylvania. I'm not trying to be facetious, but I think what I'm trying to get at is whether there is a difference when this location was formerly a foreign land. A foreign sovereign, and when a large portion of the money and land that forms the place of these schools came from the property of the sovereign. Again Your Honor, I would say that in the Girard College case, and then in the Evans v. Newton case involving a bequest by a Georgia senator, the court has said that regardless of the origin of the funds, the regular rules apply. And in those cases, the regular rules were the 14th Amendment. In this case, plaintiff, of course, is asking this court to apply the regular rules for a federal civil rights statute. Well, that helps insofar as we say, well, the money came from a bequest, or it came from a living person or a corporation. And certainly, I would have to agree with you that it answers that question, but I guess I'm still not certain whether there are any special rules that do or ought to apply in the special context of indigenous Hawaiian people. Well, Your Honor, I guess my response to that is that both the Supreme Court and this court have essentially said that Native Hawaiians are to be treated under the regular rules. And in the Rice v. Cayetano case, of course, the U.S. Supreme Court said that the category of Native Hawaiian is a racial category under both the Constitution and the Civil Rights Statute. Did it say that Native Hawaiians, did the court conclude in Rice anything about whether Native Hawaiians could also constitute a political classification? Did the court exclude that possibility? I think it did, Your Honor, by the very nature of the holding. And I would say that one of the bases for its holding was the St. Francis College case that the court had decided in 1987, and that was a Section 1981 case involving a question of what kinds of categories qualify as race under the statute. And the St. Francis College case said that ancestry, in that case it was Arab American ancestry, was a racial category for purposes of the nation's Civil Rights Statutes. Did the district court make an express finding that all of the admissions to Kamehameha School are based on race under the terms of the decedent's will? Your Honor, the court was somewhat equivocal about the standard for admission in this case. The court did acknowledge that Kamehameha, in fact, publicly acknowledges, both certainly throughout the record in the case, that it has a race-based admissions preference. I think the public statements and record statements cited in pages 7 through 10 of Plaintiff's opening brief, and particularly footnote 3 of Plaintiff's reply brief, show that this policy is both absolute and perpetual. And with all due respect to the district court, any implication to the contrary is clearly erroneous. Well, the trust as established by the will says that each year's income goes to the support and education of orphans, nothing wrong with that, right? No, Your Honor. Okay. And others in indigent circumstances, nothing wrong with that, right? No, Your Honor. Giving the preference to Hawaiians. So this is not an exclusionary provision in the will that says only to Hawaiians. So the trustees are at liberty to adopt an admissions policy in accordance with the trust that permits the entry of any person, right? Perhaps they are, Your Honor. Perhaps. What did the district court find? That's what I have to deal with in this case. I don't believe the district court made a specific finding about the terms of the will because... Well, are you asking us to give an advisory opinion as to what the duties of the trustees are under the terms of the trust? Absolutely not, Your Honor. I'm asking you to declare illegal under the federal statute the current policy of the trustees, which is both an absolute and a perpetual exclusion. But the prayer of the complaint asks expressly for equitable relief, which means some kind of modification of the terms of the trust apparently. No, Your Honor. A modification of the policy. An injunction against application of any policy or preference that is based on race. All right. Are you conceding for purposes of this argument that you're making no attack whatsoever on the will of the deceived? Yes, Your Honor. I'd be happy if the trustees applied the will in a non-discrimination... In the way it's written and the way it's expressed, you have no question but what the trust is valid and lawful. I'm not challenging the validity or lawfulness of the trust. I'm challenging the current policy as applied by the trustees for the last 40 years under which only a single person of non-Hawaiian ancestry has been admitted to Kamehameha schools and under which, by the defendant's own admission, that was an exceptionally rare case that is, quote, unlikely to recur. These are the defendant's own words. So we have what is here essentially an absolute... You're attacking the judgment of the individual trustees who, in the majority, vote for these policies. I'm attacking the application of the policy for the last 40 years. And the equitable relief you seek is against the individual trustees, not against the institution. Why did you join the estate? Your Honor, I believe the defendants in this case are the estate and its trustees and that... Well, the estate is governed by the trust instrument. That's where it is. It's in the will. And that's what I've been reading from. Yes, Your Honor. The equitable relief sought by the plaintiff in this case is against the trustees, their current application of their current policy. But you're not attacking the will. Correct, Your Honor. One of the things that you said early in your argument was directed towards what you refer to as the nation's oldest civil rights act. But the statute was reenacted in 1991, and by that time Congress had already enacted special provisions regarding the education of Native Hawaiians and had named the schools by name in an approving way with grants and pilot programs and so on and so forth. What difference, if any, does that make to our analysis as to how we fit together this school for Native Hawaiian education with 1981? Your Honor, I think the applicable principle is that bills or amendments by implication are disfavored. But, counsel, what I'm suggesting is that at least one of these congressional statements predated 1991. So it was against the background of at least one statement, which I believe was in 1988, that would have predated the reenactment of Section 1981. So why is that a repeal by implication? Well, certainly no one has been able to point to anything in the text of 1981 that would limit its applicability to Native Hawaiians or discrimination in their favor. If I recall correctly, Section 1981 was amended as part of the Civil Rights Act of 1991, which actually strengthened 42 U.S.C. Section 1981 and made the anti-discrimination provisions of that statute more widely applicable. So no one has been able to point to anything in the text of that statute or in the Native Hawaiian Education Act or other statutes that would take this case out of the regular rules for interpreting and applying Section 1981. And I think what's especially important is the Supreme Court has told us that Congress itself has expressed a fundamental public policy, a fundamental national public policy against racial discrimination in education. And for a court to, in light of that policy, there would have to be the clearest expression of intent to show that Congress had stepped back and lessened the protection against discrimination in education. And nowhere in the text of either the 1991 amendments or these other statutes can we find anything of that nature. I see that I have less than four minutes, and I would like to... Counsel, I've got a couple of other questions. We'll give you more time. We'll allow more time. I'd like to return to the Rice question and the question as to whether, in Rice, whether the court has necessarily decided that Native Americans are not a political classification as well as a racial classification. If this were being, if the school were being operated as a political entity, being operated for the kids of Republicans or Democrats or something else, presumably 1981 would not apply. Correct. If the school is limited then to Native Hawaiians, couldn't Kamehameha make an argument that that was a political recognition and not a racial classification? And does Rice answer that question? I'd say two things, Your Honor. First, Kamehameha has not made that argument. I thought that would be an issue in this case, and it's turned out not to be an issue in the case. I think Kamehameha has conceded, and certainly the district court based its opinion on the notion that Kamehameha's classification is a racial classification under the Civil Rights Act. Okay, well, whether they've raised it or not, maybe you can help me with Rice. Does Rice foreclose that argument? Yes, Your Honor, because what Rice said very clearly, and I believe we've cited the pin site in our briefs, the category Native Hawaiian as it was applied by the state of Hawaii and as it is applied by Kamehameha schools is a racial category for purposes of the Constitution and, crucially, for purposes of the federal civil rights laws. And, again, one of the linchpins of the court's decision in that regard was the St. Francis College case, and that was a Section 1981 case, a purely statutory case in which the court dealt with the argument that ancestry is not a racial classification. Yeah, but Arab Americans are a little bit different because we don't have any jurisdiction in the United States in which Arab Americans were a dominant political group that held lands and then were later recognized as a state. Native Hawaiians may be sui generis in that context. This is an indigenous people that were holding lands that were dispossessed in the late 1800s, and that Congress appears to have recognized in the Admission Act of 1959 as a political entity. I would say, Your Honor, that Rice has foreclosed that. I read Rice as being about that question. That is what this is about, and the courts came down very clearly on one side of the question, and that is that for purposes of the Constitution and the civil rights laws, the ancestry-based category of Native Hawaiian is a racial category. Would Congress be foreclosed from today trying to correct that by saying Native Americans are akin to an Indian tribe? Does Rice foreclose Congress from doing that? I don't know, Your Honor, and I don't think that question is presented by this case. There were some hints in Rice, I think, and this Court's recent decision in, I'll call it the Norton case, shed some additional light on that question, but this is a statutory case. Section 1981 is enforced. It has not been amended, and the Court obviously needs to apply the statute as it is written under the interpretations that the courts have given. I'd like to reserve the balance of my time for rebuttal. We'll restore some extra time for you when the time comes. May it please the Court. I'm Kathleen Sullivan. I represent the Kamehameha Schools, Bishop Estate, and its distinguished and dedicated trustees. Your Honor, the nation's oldest civil rights statute most certainly is not violated by the program at issue in this case, and there are five features of the program that make it clear that 1981 is not violated by the admissions preference here. As Judge Beeser pointed out at the outset, this is a private school that takes no federal money, so it's not covered by the 14th Amendment Equal Protection Clause invoked in Brown, nor is it covered by Title VI because the Kamehameha Schools receive not a dollar of federal expended funds. The second feature is that this is a remedial program. It's odious to compare the preference for Native Hawaiians in this case to the white-only academies in Runyon v. McCrary established to create an end run around Brown v. Ford's desegregation orders because this preference is to remedy a long history of dispossession, disadvantage, oppression, and the near annihilation of a culture through education, and that's the third key feature. As Judge Graber noted recently in the Seattle Schools case, context, historical and factual context, is very important. This is not an employment case. It's an education case. Education of K-12 students to empower them, to socialize them, to undo a history of oppression and send them out into the world as successful Native Hawaiian adults leading their community. As Judge Beige pointed out and as Judge Graber pointed out, it matters that this is an indigenous people. This is an indigenous people that has no other homeland on the face of the earth, an indigenous people that was, through the admission of Congress, had its sovereignty overthrown with the aid of the United States in 1893, and for which Congress 100 years later apologized and acknowledged the devastating consequences to that indigenous people of its overthrow. And the fifth feature that matters here is, as Judge Graber so correctly pointed out, is that Congress itself has enacted, on either side of the reenactment of 42 U.S.C. 1981, a substantial number of preferences expressly and exclusively for Native Hawaiians using the identical definition to the one that Kamehameha Schools uses of who a Native Hawaiian is, that is someone who can, through documented evidence, trace ancestry to residence in the islands before 1778, and which uses the identical sort of preference in education to help advance Native Hawaiians today. If you take three propositions together, I have some concern about your argument. If you take the principle of Runyon that Section 1981 applies to the contracts formed when parents send their students to a private school, and you take the decision in rights, and you take the Supreme Court decision that says that 1981 is a two-way street, that is that not only can non-whites have the same contracting opportunities, but vice versa as well. If you put those three things together, it kind of appears to throw a monkey wrench into your argument. Not at all, Your Honor. We, willing to concede for purposes of this case, that this is a contract case, that this is a commercial school, and that you can consider Native Hawaiian status as a race for purposes of this case. But that does not end the question. And certainly just to address the Rice point, if I may, Judge Bybee, the answer to your question about Rice is that it most certainly did not preclude Congress from recognizing Native Hawaiians with the equivalent of tribal status, and it certainly did not foreclose the kind of preference at issue in this case. In fact, in Rice, Justice Kennedy, writing for the majority, most pointedly reserved the question of whether some Native Hawaiian preferences might in another case be permissible under the 14th Amendment Equal Protection Clause or any other provision of the Constitution. He limited the result to the 15th Amendment. Why would the 15th Amendment's prohibition against restrictions on voting based on race then apply in Rice, but the 14th Amendment's prohibition against equal protection, not? Why wouldn't we get strict scrutiny under equal protection, presumably, if it was a state-based discrimination? Now, how do some of those qualify under strict scrutiny under the 14th Amendment but fail the 15th Amendment? It's not this case, obviously, Your Honor, because to go back to Judge Beezer's initial point, this is a private school that takes no public money. Strict scrutiny has never been applied to a private educational institution. Do you pay taxes to the United States or to the state of Hawaii on real property or income? Kamehameha Schools enjoys a tax exemption like other non-profit entities. Like Bob Jones? Different from Bob Jones, Your Honor, because quite unlike Bob Jones, Kamehameha Schools has been ruled by the IRS in, first of all, the tax exemption doesn't create federal financial assistance for purposes of Title VI, but quite unlike Bob Jones, which was held to violate the public policy of the United States, the IRS has expressly approved Kamehameha Schools' admissions policy. Now, this is outside the record. We can certainly supply the Court with cites if you need it, but in the General Counsel memoranda, the IRS has said both in 1999 and in 2000 after the issuance of the Rice decision that Kamehameha Schools' tax exemption does not violate public policy, so Bob Jones does not negate the policy in this case. But to go back to Judge Bybee's question about the difference between the 14th and 15th Amendment, what Justice Kennedy said precisely, and counsel for the plaintiffs was incorrect on this, what Justice Kennedy said precisely in Rice is that even if Native Hawaiians were a tribe and even if the Morton v. Moncari deferential standard applied in other contexts, it couldn't apply to the exclusion of non-Native Hawaiians from the vote for a state institution. That is, if it had been a vote for a tribal entity, a vote, as you suggested, for a tribal entity as opposed to a state entity, it might have been allowed. In the 15th Amendment, we have to understand what Justice Kennedy is saying. It had a special categorical virtually per se rule against race discrimination. Obviously, in the 14th Amendment context, the Court has said context matter, and it's upheld even plainly racial remedial programs as it did in Grutter in the Michigan case last year. If I heard you correctly, for purposes of this case, Native Hawaiians are a race. Are they also a political classification? We don't depend on that claim, Your Honor, but it is very important to the interpretation of 1981. And again, counsel for the plaintiffs was incorrect. There is expressed statutory language in the Native Hawaiian Education Act of 2002. I'd cite you to pages 120 and following of the excerpts of record. This is the district court opinion. Pages 120 and following of the excerpts of record, District Judge Kaye's very erudite and thorough opinion cites at length the provisions of the Native Hawaiian Education Act of 2002, which says Congress does not extend services to Native Hawaiians because of their race, but because of their unique status as the indigenous people of a once sovereign nation as to whom the United States has established a trust relationship. The political status of Native Hawaiians is comparable to that of American Indians and Alaska Natives. And on the next page, 121, the political relationship between the United States and the Native Hawaiian people has been recognized and reaffirmed. Please note that's relevant, Judge Graber, as you suggested, to interpreting 1981. Don't you run into the repeal by implication problem? In other words, you're quoting congressional statements in 2000 to try to figure out what Congress, a different Congress had in mind, different individuals, different Congress had in mind in 1991. Originally, obviously, there was no intention when 1981 was originally passed, Hawaii was a sovereign kingdom. So there was no intention to cover anybody. By 1991, Congress intended whatever it intended, but there's essentially no legislative history to tell us what that meant. And I have some difficulty, just speaking for myself, looking at later enacted statutes to interpret what the other Congress had in mind. Well, Your Honor, let me be clear. We're not suggesting that 1981 was repealed by implication by the Native Hawaiian Education Act or other preferences for Native Hawaiians. We're arguing that 1981 never applied in the first place to remedial preferences, especially by private institutions for Native Hawaiians. But in deciding whether that's true, don't we have to look either at contemporaneous things happening in 1991 or something that happened earlier? Absolutely, Your Honor. Two things happened between 1866 when Congress enacts what became Section 1981 and 2002 and the Native Hawaiian Education Act's reenactment. First of all, the Civil Rights Act of 1964 was passed. And as interpreted in an unbroken line of decisions since Weber in 1979, Title VII, like 1981, Title VII inflects the interpretation of 1981. It's been interpreted to allow remedial race-conscious programs by private employers. Weber says, and this circuit has endorsed the same principle, that you can't open the door to private remedial race-conscious programs for employers all throughout the country through Title VII and then close the door again with 1981. And so we can dispatch easily the standard of review here. A plaintiff seeks to invoke strict scrutiny, which has never been applied to a private institution under any civil rights law. He can cite no case to that effect. But clearly after the Civil Rights Act of 1964 comes along, every Title VII employment contract can be challenged under 1981. And corporate America would have been most surprised to wake up on the day after Grutter and Grass and found out that a single footnote at the end of each opinion referring to 1981 as surplusage. I quite agree with Judge Bybee that it was surplusage to make the 1981 rulings in those cases against a public actor. The standard of review can't be strict scrutiny. So one thing that happened, Judge Graber, is that private remedial race-conscious action in employment, and here we submit an education, has been permitted because the Civil Rights Act of 1964, as interpreted by the courts in an unbroken line of cases since Weber, says that we have to allow private institutions to experiment, to overcome the effects of past discrimination. We can't turn every private institution into a public institution. And the second thing that happened, Judge Graber, is in 1993 Congress apologized for the overthrow of the Kingdom of Hawaii and admitted United States complicity in that. That's post-reenactment of the statute. Correct, Your Honor. But in 1988, Your Honor, is absolutely correct. 1993 culminates a series of legislative initiatives. For education purposes, let's focus on 1988. Stafford-Hawkins Act of 1988 is the first explicit educational set of preferences for Native Hawaiians through federal subsidies. In Stafford-Hawkins, Stafford-Hawkins not only, as Judge Graber quite correctly said, names Kamehameha Schools by name as one of the Native Hawaiian educational organizations who can help carry out this mission of remedying the terrible deficits in Native Hawaiian education to that date. Stafford-Hawkins actually relied, as did the 1994 Native Hawaiian Education Act and the 2002 reenactment of the Native Hawaiian Education Act, so 1988, 1994, 2002, actually relied on findings of Native Hawaiian educational disadvantages that had been made by the Kamehameha Schools. So you have Congress acknowledging Kamehameha Schools by name in 1988. It cannot be that the Congress that reenacted 42 U.S.C. 1981 in the year 1991, having just enacted explicit and exclusive preferences for Native Hawaiians in the 1988 Stafford-Hawkins Act, thought that 1981 in any way barred the issuance of those preferences. Any evidence that they even thought about it? There's no direct evidence in the legislative history that they thought about it in 1988. Your Honor, there's evidence in the legislative history that they thought about it with respect to the 2002 reenactment where there was a committee report. I recognize that's not the statute, but a committee report. The Labor and Education Committee in the House actually issued a committee report urging Kamehameha Schools to redouble its efforts, something that it's done. That doesn't really have anything to do with 1981. It doesn't sound like Congress was sort of consciously thinking, well, as we encourage you to do this, we're aware that you're somehow exempted from 1981. That attributes quite a bit of deference to Congress. Fair enough, Your Honor. But it's, of course, the duty of the courts to reconcile statutes where it's possible to reconcile them, and we submit the best way to reconcile the issuance of Native Hawaiian preferences beginning in 1988 in education with the reenactment of 1981 in the year 1991, is to say that 1981 was never meant to preclude remedial racial preferences in the first place. And there's a line of cases that already exist by that time in the employment context of holding race consciousness. That's quite a chain of circumstances, beginning with a statute that's enacted in 1866, but it then is altered by the Civil Rights Act of 1964, which is then followed by, as you pointed out, the 1993 Congressional Apology, and the 1988 Stafford-Hawkins Act, and the 2002 Native Education Act. Those are all post-enactment. I'm not sure that I see that even the 1991 amendments to the Civil Rights Act of 1866 as readopted in 1871, affected anything of substance that would protect Kamehameha. Your Honor, 1981, the statute 1981, never was meant to apply to preclude. It applies, let's concede it applies, but it was never intended to apply to preclude a remedial educational program for indigenous children of the very kind that Congress itself supported in an unbroken line of legislative enactments beginning before reenactment, beginning in 1988 before the 1991 reenactment. Now let me explain why that's so. In other words, we believe that the Congressional enactments make this case easy, because you cannot find that 1981 is violated by the very same preference programs that Congress on either side of 1991's reenactment of 1981 reenacted. Counsel, I have two quick questions for you. I don't know if the answers will be quick, but the first one is a question that I asked opposing counsel, and that is, does it make any difference to our analysis, or should it, that a significant portion of the wealth and the lands that created the schools came at least indirectly from the former king of this kingdom when it was kingdom? Absolutely, Your Honor, we believe it does. It matters to the interpretation of 1981 in this case that this is restoration of a culture and remedy of educational disadvantages using the land that Princess Pawahi left in trust for her children, which she thought of as her extended family. And here's why it's relevant. It's relevant to showing that this is a remedial use of rates and that it's appropriately tailored. And the standard here is, is there a reasonable relationship to a remedial purpose? And does the approach of this program not unreasonably exceed, does not unreasonably exceed that? And the reason why the restoration of Hawaiian culture is so relevant here is that this is a unique case. This doesn't mean that an all-black Malcolm X Saturday school is necessarily immune from 1981 because of this case. But where you're seeking through the Kamehameha schools in an unbroken line of educational efforts from 1893 from the overthrow to the present to reeducate a people who had been decimated in population, reduced to a tenth of their number, had their language banned, had their culture destroyed, had their very existence on earth nearly wiped out. When you're trying to remedy that sort of dispossession of an indigenous people, there should be tolerance for the efforts of a private trust to do that. The claim of uniqueness is a nice segue to my second question, which is what relationship, if any, you may or may not be able to answer this, but what relationship, if any, does this case have to the Arakaki case, which was argued to a slightly different panel earlier this week? And is there a sufficient relationship, in your view, to warrant waiting for the result of that case before deciding this one? No, Your Honor. We believe this case is entirely separate from the Arakaki case because this is about an entirely private institution, not a state institution, and because, therefore, the Fourteenth Amendment issues don't arise. As I said to Judge Bybee earlier, we do not believe that Norton v. Moncori in any way precludes consideration of race, consideration of Native Hawaiians in a different way in Arakaki than it was in Rice. But we view the cases as separate. There's no reason to await an outcome in Arakaki or in Norton v. Kauia-Alaha in order to decide this case because we're a private entity, no Fourteenth Amendment issues at stake. But just to go back to why a private remedial educational program for indigenous children of the exact same type as Congress has enacted satisfies any review under 1981. Let me stop you there, Counsel. Are the enactments by Congress in which Native Americans are referenced, is Congress referring there to a racial classification or is it referring to a political classification? It doesn't make a difference. We submit we went even if it's a racial classification because remedial race-conscious educational programs for indigenous people are acceptable under 1981 with or without Congress. But Congress, by its own words, which I just read to you from the NHEA, passed by the 2002 Congress, the Native Hawaiian Education Act, referred to a political status. Where is that political status conferred by Congress? Is the recognition in 2002, is that sufficient and is that the act that we ought to look to? Does it take something more formal along the lines in which Congress has recognized or provided a mechanism for recognizing Indian tribes? Your Honor, to resolve the issue in Kauia-Alaha or in other cases involving tribal status, you may need a more explicit word from Congress about whether tribal status has been created. In fact, in Norton v. Kauia-Alaha, the court recognized that it will be up to Congress, not to the courts, to decide whether tribal status is conferred. This case does not involve or depend upon that. Does that then suggest that our court has held that Congress, in fact, has not recognized Native Hawaiians as a tribe? No. Kauia-Alaha was on a very narrow issue of whether the Bureau of Interior could treat Indian Native Americans differently from Native Hawaiians and use the Norton v. Moncari standard because it was treating Indians preferentially. Then let me take the next question. Has Congress recognized Native Hawaiians as a political entity? And if so, what is the act that did that? It has not done so to date. There is a bill pending that's come out of the House and is going to the Senate floor. There's been an agreement reached by Senator Inouye together with Senator Kyle and other Senators that it will come to the floor by summer of 2005. It's known colloquially as the Akaka Bill. That's not occurred, but nothing in our case depends on the recognition of that political status. What matters here is that this is an appropriate means for remedying devastating socioeconomic and educational deficits that continue to be suffered by the Native Hawaiian people who are at the bottom of the ladder in this state in every indicator of social and economic well-being, whether it's poverty, homelessness, teenage pregnancy, dropout rates. Are all of those criteria for admission? Do you get a preference? Does poverty get a preference on the scale? Absolutely, Your Honor. At the time that plaintiffs applied to the schools, 15% of the places in the school were reserved for indigent and orphaned children. That's since been increased to 25%. Every student in the school is subsidized since the school pays 90% of the cost of education for every student, and nearly 70% of the students at the time were on financial aid, even with respect to that 1,700. So the socioeconomics of the people who attend the Kamehameha schools resemble those of the broader Native Hawaiian community. That is at the very bottom of the socioeconomic ladder in every respect. And just to respond to plaintiffs' claim that this is an absolute and perpetual bar, it is nothing of the sort. This is a transitional effort to train Native Hawaiian students to go out, empowered by studying their once-suppressed traditions and ancestral customs and language, to go out and lead their society. Dramatic steps have been made in the two decades since the first Stafford-Hawkins Act was passed and since Kamehameha schools first began redoubling its efforts, as the Congressional Committee urged it to do. Dramatic strides have been made. Test scores are going up. The percentage in the record in the Shonkai and Opuni Epidemic, you'll see that the percentage of Native Hawaiians who go to the University of Hawaii has improved dramatically. We've only had one decade since the apology resolution. Surely it's too much to expect the work of the Kamehameha schools to undo as over a century of oppression and a nearly destroyed culture can affect a transition that quickly. But the trustees review the policy regularly. And to go back to Judge Beezer's reference to the will, the will was interpreted by Princess Kauahi's husband, Charles Bishop. She was trained by missionaries. She had her zeal to open the school, developed by the missionaries who trained her. Charles Bishop said at the beginning that when Native Hawaiians have been lifted up, have been brought up to a status in which they can be self-sufficient again, then those places in the school can be open to other people. But we're nowhere near that time. The trustees reviewed the role of the school as recently as 2000 in its strategic report, 2002-2003, to see whether the preference was still needed in the on-campus programs. And I should point out that the schools do a lot more than the on-campus programs. They have preschool, afterschool, continuing education, summer schools, extension schools, many of which are open to non-Native Hawaiians. And they've assisted the State Department of Education in opening charter schools, which are open to non-Native Hawaiians. So it's far from the case that Kamehameha Schools operates as plaintive, incorrectly asserted a segregated operation. Indeed, it's multiracial. But just to complete the point, it's not absolute, it's not perpetual. It is transitional, it is successful, and it would be a tragedy if the nation's oldest civil rights statute were to be used to stop, at the very moment of its greatest success, acknowledged by a bipartisan set of leaders inside and outside the Native Hawaiian community. You have declarations from both former Governor Ariyosha and current Republican Governor Linda Lingle to this effect. It would be a tragedy. To use the nation's oldest civil rights statute, a remedial statute designed to enable freedmen to buy things in local stores and in the reconstruction south, a travesty to take the statute passed by the 39th Congress, the same Congress that passed the Freedmen's Bill, and gave 40 acres and a mule so that freed slaves could get their start in life, a travesty to apply that to strike down this remedial program of a private school of exactly the kind that Congress deputizes other Native Hawaiian educational organizations to apply all the time. Were plaintiff correct, you would unleash a set of 1981 lawsuits against all the private entities throughout the state who are the beneficiaries of the 85 statutes in which Congress gives aid for Native Hawaiian preferences. We submit that nothing in a footnote in grassroot rhetoric could possibly, possibly mandate any form of heightened scrutiny of that sort of result, none of the correctly deferential scrutiny taking all five factors into account. It's a private school. It takes no federal dollars. It's a remedial program. It's education K-12 designed to take students who are made fun of when they go to DOE schools, stigmatized for their long and difficult to pronounce names and for their language and their faith, taking them into the command schools and giving them an opportunity to become the leaders of their society. It's education, context matters. They're indigenous. We've discussed that, and it's been a preference of the exact kind that Congress itself has enacted into law and deputized other private organizations to enact. We submit that has to satisfy the appropriate scrutiny under 1981, even if this is considered a race case. Thank you. Dean Sullivan, I have a technical question. In light of the concession of counsel, that there's nothing in the will of Bishop that is under attack in this case, and since the first defendant named in the action is the Bernice Bishop estate, does the estate have any real interest in this proceeding? I understand the trustees do. Yes, Your Honor. What's the interest of the estate that is in dispute? There's no interest of the estate. Well, then why isn't it dismissed? That would be fine with us, Your Honor. Okay. Well, if there's no real interest, I don't know why you're here on that score, but I can see why you would be here defending the trustees. Your Honor, the trustees, as you can see from the record, work diligently to try to make sure that their programs are a success and that they last any longer than necessary. I understand, but if the estate is dismissed, the language of the trust as laid down by the decedent remains the controlling governing document of the institution. That's right, Your Honor. And I think that – Your Honor, perhaps the easiest answer is to say that the princess in her will and the language of the will left to the discretion of the trustees, the administration of the trust, and it has been in the discretion of trustees, guided by Charles Bishop. But if they violated the civil rights, it's the trustees' problem, not the school's problem. Yes, Your Honor, except, of course, nothing here violates the civil rights. I understand. We understand your position. So it would be appropriate for the court to enter an order of dismissal as to the estate, right? If you so interpret the will, Your Honor, yes and no. Thank you. If there are no further questions, thank you very much. Thank you. We're going to restore five minutes at least for rebuttal, Mr. France. Thank you, Your Honor. It's been a rather wide-ranging conversation. Yes. I'll start with the one point on which I agree with Dean Sullivan, and that is that the Arakaki case is not applicable, and this court should not wait to issue its decision. The word remedial has been bandied about quite a bit here. It is not plaintiff's position that 42 U.S.C. Section 1981 is an absolute prohibition against race-based conduct. The courts have been clear under both strict scrutiny and under Title VII scrutiny that certain remedial programs are permissible. But the courts have also been absolutely crystal clear that remedial for this purpose means remedying discrimination within the entity under challenge, whether it's public or private. In the strict scrutiny standard, this court, in numerous cases, including Coalition for Economic Equity v. Wilson and others, has been very clear that it's discrimination by the entity involved. In the Title VII context, this court in the Rudabush case, cited prominently in our briefs, decided just last year, has said that private entities may remedy internal imbalances, and the district court itself recognized that Title VII has an inherently internal focus. What do you make of the comments by the Supreme Court in Gretzengrader, though, that discussed the need to educate leaders of society and to make society reflect the diversity of population and diversity of viewpoint and so on and so forth? Diversity was obviously central to those two cases, Your Honor. But isn't there some external focus in the discussion? No, Your Honor. In fact, the briefs address this point because Counsel Dean Sullivan and I have argued about this before. Justice O'Connor was concerned to show that the path to leadership be visibly open to persons of all races, and that supported the diversity rationale in those cases. If applied to Kamehameha schools, that means that the path to leadership provided by Kamehameha schools, and we've seen in the record the wonderful achievements and accomplishments of Kamehameha graduates, needs to be open to children of all races, and that's precisely the opposite of what Kamehameha has done. Kamehameha is not open to children of all races. Children like my client who don't have the right race, the non-preferred race, the wrong bloodline, are foreclosed. And I think that takes us to Dean Sullivan's point about the nature of this preference. She says that it's transitional. It's been in transition for 117 years. But she says the trustees reviewed it last year, but they say that they're nowhere near changing the preference because as the district court found, the goal of the schools is to educate all native Hawaiian children. But in 117 years, they've reached only 7% of their goal. I don't know what that extrapolates, but it's something like 1,000 years before they would reach their goal. Are the public schools of Hawaii doing a better job or a worse job? I don't know, Your Honor. That's available to your client. I'm just wondering what the problem is, why the transfer. Are they completely satisfied? Are your clients completely satisfied with the public schools of Hawaii? No, my client would like to take advantage of the manifestly valuable educational program of Kamehameha Schools.  If there were a native Hawaiian school, but it was doing a lousy job, nobody would probably touch it or worry about it or try to challenge it. So the fact is that it's really their success that's caused this case to happen. Well, Your Honor, the sin, so to speak, is unequal treatment on the basis of race. And I would like to respond to what I call the doomsday scenario. The relief sought by the plaintiff in this case is not to shut down Kamehameha Schools. Dean Sullivan would have you believe that if the plaintiff prevails, Kamehameha Schools would end and its mission would fold up, so to speak. All we're asking is for the schools to operate on a race-neutral basis. It could be financial need. It could be academic need. It could be a preference to children with a demonstrable commitment to Hawaiian history and culture. Some of those elements are mandatory under the will, and the only preference is the native status. They have to find and they have to teach good moral character and a whole number of things that have to be done under the will that they're doing. And that's what keeps the school its quality. Yes, Your Honor, and we fully support those, and those are not under attack here. What's under attack is the racial exclusiveness. One student in the last 40 years of non-Hawaiian ancestry. If this case involved black children or Hispanic children, we wouldn't even say in polite society that that wasn't an absolute exclusion. That's the central fact in this case. I want to go back. I know your time's up, but I'm going to ask you this anyway, and we'll give you some extra time as well. I want to go back to your question or your comments about internal focus on diversity versus external focus on diversity. And what would we do, and I know this is a public setting, which really raises a whole host of different questions, but what would we do with a school system? Let's say that the public schools who are educating all the children here determined that for well-documented reasons, children who are African-American should have a special program over here and Native Hawaiian children over here. In other words, that while there's an overall diversity, it might take place in different physical locations or different institutions. Is that a forbidden kind of thinking? We would say that's Brown versus Board of Education, Your Honor, and that's the danger in this case. If this program is upheld, there's nothing to stop the state of Hawaii under the similar standards from engaging in precisely the same kind of segregation of its citizens. Except that it's public, and there's no public money at all, as I understand it. But, Your Honor, Section 1981 and the 14th Amendment would apply there both. Last question to you, for me at least, is based on something that Dean Sullivan said, but it's something that I've always been very interested in and have seen very little about, and that is when Section 1981 was originally enacted, way back when, simultaneously there were preferential statutes enacted for African-Americans at that time, where Congress singled them out and said, here are some things to help you out. How does that fact affect our analysis of Section 1981, if it does at all? What relevance does that have to our understanding of its scope and meaning? Your Honor, I cited the Rivers v. Roadway Express case in my reply brief, and there the Supreme Court told us that the interpretation of a statute is for the courts, and once the Supreme Court, especially, has spoken authoritatively on the statute, that's what it means, what it always meant, what it will mean in the future, until Congress, through legislation, changes that. And the Supreme Court has told us that Section 1981 forbids discrimination for or against persons of any race. And what plaintiff is asking here is that the statute be applied according to its normal rules. There is no exception for Native Americans. Rice made that clear, the case made that clear, the regular rules apply, and for that reason, plaintiff submits that the judgment of the district court should be reversed. Thank you very much. With that, the case gets started as submitted.
judges: Breezer, Graber, Bybee